RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0189p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

STATE OF TENNESSEE (15-3291); STATE OF NORTH
CAROLINA (15-3555),

*Petitioners*,

NATIONAL ASSOCIATION OF REGULATORY UTILITY
COMMISSIONERS,

*Intervenor*,

*v.*

FEDERAL COMMUNICATIONS COMMISSION; UNITED
STATES OF AMERICA,

*Respondents*,

ELECTRIC POWER BOARD OF CHATTANOOGA; CITY
OF WILSON, N.C.,

*Intervenors.*

Nos. 15-3291/3555

_____

On Petitions for Review of an Order of
the Federal Communications Commission.
No. 15-25.

Argued: March 17, 2016

Decided and Filed: August 10, 2016

Before: ROGERS and WHITE, Circuit Judges; HOOD, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Joshua S. Turner, WILEY REIN LLP, Washington, D.C., for Petitioner in 15-3291. John F. Maddrey, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Petitioner in 15-3555. Matthew J. Dunne, FEDERAL COMMUNICATIONS

_____

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

COMMISSION, Washington, D.C., for Respondents. **ON BRIEF:** Joshua S. Turner, Megan L. Brown, WILEY REIN LLP, Washington, D.C., for Petitioner in 15-3291. John F. Maddrey, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Petitioner in 15-3555. Matthew J. Dunne, Richard K. Welch, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Respondents. James Bradford Ramsay, NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, Washington, D.C., for Intervenor National Association of Regulatory Utility Commissioners. James Baller, Sean A. Stokes, Ashley Stelfox, BALLER HERBST STOKES & LIDE, PC, Washington, D.C., James P. Cauley III, Gabriel Du Sablon, CAULEY PRIDGEN, P.A., Wilson, North Carolina, for Intervenor City of Wilson. Frederick L. Hitchcock, Willa B. Kalaidjian, CHAMBLISS, BAHNER & STOPHEL, P.C., Chattanooga, Tennessee, for Intervenor Electric Power Board of Chattanooga. William J. Kirsch, Arlington, Virginia, Andrew L. Brasher, OFFICE OF THE ALABAMA ATTORNEY GENERAL, Montgomery, Alabama, Conor B. Dugan, WARNER NORCROSS & JUDD LLP, Grand Rapids, Michigan, Richard A. Samp, WASHINGTON LEGAL FOUNDATION, Washington, D.C., David Parkhurst, NATIONAL GOVERNORS ASSOCIATION, Washington, D.C., Bartlett Cleland, Jonathan Hauenschild, AMERICAN LEGISLATIVE EXCHANGE COUNCIL, Arlington, Virginia, Ashley Stelfox, BALLER HERBST STOKES & LIDE, PC, Washington, D.C., Mark C. Del Bianco, LAW OFFICE OF MARK C. DEL BIANCO, Kensington, Maryland, Andrew Jay Schwartzman, Eric G. Null, INSTITUTE FOR PUBLIC REPRESENTATION, Washington, D.C., Lani L. Williams, LOCAL GOVERNMENT LAWYER'S ROUNDTABLE, INC., Oconomowoc, Wisconsin, Kimberly Hibbard, NORTH CAROLINA LEAGUE OF MUNICIPALITIES, Raleigh, North Carolina, Markham C. Erickson, STEPTOE & JOHNSON LLP, Washington, D.C., for Amici Curiae.

ROGERS, J., delivered the opinion of the court in which HOOD, D.J., joined, and WHITE, J., joined in part. WHITE, J. (pp. 23–25), delivered a separate opinion concurring in part and dissenting in part.

————————

**OPINION**

————————

ROGERS, Circuit Judge. Municipalities in Tennessee and North Carolina providing broadband service would like to expand their networks beyond their current territorial boundaries to underserved nearby areas. The legislatures of Tennessee and North Carolina have passed laws either forbidding or putting onerous restrictions on such expansion by municipal telecommunications providers. The Federal Communications Commission (FCC), citing its statutory mandates to remove barriers to broadband service and to promote competition in the telecommunications market, has issued an order purporting to preempt these state statutory provisions. Tennessee and North Carolina now seek review of the FCC's order.

The FCC order essentially serves to re-allocate decision-making power between the states and their municipalities. This is shown by the fact that no federal statute or FCC regulation *requires* the municipalities to expand or otherwise to act in contravention of the preempted state statutory provisions. This preemption by the FCC of the allocation of power between a state and its subdivisions requires at least a clear statement in the authorizing federal legislation. The FCC relies upon § 706 of the Telecommunications Act of 1996 for the authority to preempt in this case, but that statute falls far short of such a clear statement. The preemption order must accordingly be reversed.

**Tennessee Law**

Under a Tennessee law enacted in 1999, any municipality operating an electric plant is authorized to offer cable services, video services, and Internet services. Tenn. Code Ann. § 7-52-601. However, this authority is limited—the statute grants a municipality this authority only "within its service area." *Id.* This geographic limitation forbids a municipality from offering Internet services to surrounding areas that are not served by that municipality's electric plant.

The territorial restriction in § 601 does not require municipalities to violate any FCC requirement. There are no FCC rules or regulations requiring municipalities to expand their service offerings beyond their territorial boundaries. Tennessee, in enacting § 601, has simply made the choice for its municipalities on the issue of expansion, which is a discretionary decision under the current FCC regulatory scheme.

Chattanooga, Tennessee operates an electric provider known as the Electric Power Board (EPB). *In re City of Wilson, North Carolina*, 30 FCC Rcd. 2408, 2015 WL 1120113, at *7 (2015). The EPB offers high-speed broadband Internet service with speeds up to one Gigabit per second (Gbps). *Id.* The EPB offers this service to 170,000 residential and commercial customers in its 600-square-mile service area, which includes counties in Tennessee and Georgia. *Id.* at *7, *10. In 1996, the EPB began developing a high-capacity fiber-optic communications infrastructure. *Id.* at *10. In 2009, the EPB made its fiber-optic communications services available to residential customers and, in 2010, became the first

broadband provider in the nation to offer Gigabit services to all its customers. *Id.* About 63,000 of the EPB's electric service customers subscribe to the fiber services. *Id.*

The EPB's fiber-optic network has received uniform praise. It has led to job growth and attracted businesses to the area. *Id.* at *7–8. Its introduction led established Internet providers to lower rates while increasing the quality of their services. *Id.* at *7. The fiber network has also put more money in Chattanooga's coffers, which contributed to Standard and Poor's upgrading of the EPB's bond rating to AA+ in 2012. *Id.* at *8.

Educational institutions within the EPB's service area have benefitted from the fiber network. *Id.* The high-speed network is available to Chattanooga schools and allows the schools to offer services not available in many parts of the country. *Id.* Further, Chattanooga's public library system—with a 14,000 square foot space dedicated to innovation—is a leading one in the nation. *Id.* The New York Public Library has announced that it sees Chattanooga's library as a model for its renovations. *Id.*

Neighboring communities outside of the EPB's service area, however, cannot partake in the EPB's high-speed Internet service due to the geographic limitation in § 601. Residents from those communities have repeatedly requested expansions of the EPB's services to the surrounding areas. *Id.* at *9. The EPB's surrounding communities allegedly constitute a "digital desert" in which the Internet services are abysmal or nonexistent. *Id.* These areas are known as "unserved" and "underserved" areas. *Id.*

### North Carolina Law

Under a North Carolina law originally enacted in 1971, municipalities were authorized to provide broadband Internet services. *See* N.C. Gen. Stat. Ann. § 160A-311; *BellSouth Telecomm., Inc. v. City of Laurinburg*, 606 S.E.2d 721, 726–28 (N.C. Ct. App. 2005). In 2011, North Carolina's General Assembly passed Session Law 2011-84, entitled "An Act to Protect Jobs and Investment by Regulating Local Government Competition with Private Business," which among other things imposed requirements on city-owned communications service providers. *See* N.C. Gen. Stat. Ann. §§ 160A-340 to -340.6. Under § 160A-340.1(a)(3), city-owned communications service providers are directed to "[l]imit the provision of

communications service to within the corporate limits of the city providing the communications service." Thus, municipalities in North Carolina may not offer Internet services to anyone beyond their municipal boundaries.

The Session Law contains additional restrictions that focus on the financial operation of municipal providers. Sections 160A-340.1(a)(9) and -340.5 of Session Law 2011-84 require municipalities to make payments in lieu of taxes that would equal the amount a private-sector provider would have to pay in taxes and fees. Section 340.1(a)(8) requires municipalities to impute the costs of private providers when pricing the municipal services. Section 340.1(a)(1) requires municipalities to comply with all of the laws and rules that apply to private providers (without exempting municipalities from generally applicable municipal regulations). Section 340.1(a)(5) requires municipalities to open their facilities for private providers at no charge if the municipalities themselves would not have to pay. Section 340.1(a)(7) forbids municipalities from subsidizing their "communications service with funds from any other non-communications service." A separate part of Session Law 2011-84 amended the state's definition of "public utility" to include municipal providers of broadband, which exposes them to regulation from the state's Utilities Commission.

The Session Law also contains restrictions on the implementation of municipal services. Section 340.3 requires a 75-day public hearing process before a municipality can provide communications services, and § 340.4 requires a special election on the issue of municipal entry into communications services. Section 3 of Session Law 2011-84 mandates a period for private providers to comment on municipal entry. Under § 340.6, municipalities must solicit public-private partnership proposals before a municipality can begin construction on a communications network.

The Session Law, in § 340.2, includes three provisions that exempt municipalities from the restrictions. The first of these provisions, § 340.2(a), exempts city providers from the Session Law restrictions if the providers use the telecommunications services only for "internal governmental purposes" or within another city's corporate limits so long as the other city is a party to an "interlocal agreement." Section 340.2(b) exempts municipalities serving "unserved areas" from the restrictions. An "unserved area" is defined as a "census block . . . in which at

least fifty percent (50%) of households either have no access to high-speed Internet service or have access to [such] service only from a satellite provider." Lastly, in § 340.2(c), there is a series of "grandfather" exemptions, which exempt municipalities "providing communications service as of January 1, 2011," from the restrictions so long as those municipalities abide by certain limitations.

Like Tennessee's restriction, the North Carolina provisions do not require municipalities to violate any FCC rule or regulation. This is clear from the record, and in any event was conceded by the FCC's counsel at oral argument. The Session Law is simply an instance of North Carolina making choices for its municipalities on the issues of expansion and municipal offering of telecommunications services.

In 2005, the City of Wilson, North Carolina constructed the backbone of a fiber-optic network connecting all City-owned facilities. *In re City of Wilson*, 2015 WL 1120113, at *10. Many residents, medical facilities, businesses, and educational institutions requested access to and expansion of the network. *Id.* at *11. In 2006, the Wilson City Council responded to these requests by unanimously voting to build a municipal broadband network that would eventually become known as "Greenlight." *Id.* at *10. In 2013, Wilson rolled out Greenlight to residential customers, offering Gigabit Internet service. *Id.*

Greenlight has provided benefits for Wilson. Wilson states that its "triple play" services—phone, Internet, and cable—are cheaper than its competitors' and that it offers its Gigabit Internet while maintaining a positive cash flow. *Id.* at *11. Wilson also provides free Wi-Fi to its entire downtown area, which in turn frees up money that downtown businesses would normally spend for Internet. *Id.* Each of the top seven employers in Wilson is a customer of the fiber network. *Id.* Local schools benefit from using Greenlight, as does the City's main public library. *Id.*

Wilson has only deployed Greenlight in one county, Wilson County. *Id.* at *10. It has five other counties for which it provides electric service. *Id.* Individuals in those five counties have repeatedly requested that Wilson expand its offering of Greenlight. *Id.* at *13. Wilson is currently exempt from the restrictions in §§ 160A-340 to -340.6 due to the grandfather

provisions contained in § 340.2. If Wilson attempted to expand its offering beyond its corporate limits, however, it would no longer fall under the grandfather exemption and would have to abide by all of the restrictions, which would include the territorial restriction in § 340.1(a)(3). Therefore, due to the restrictions in §§ 160A-340 to -340.6, Wilson is unable to expand its offering beyond its municipal limits.

**The FCC's Order**

The EPB and the City of Wilson separately petitioned the FCC to preempt the restrictions in their respective states' laws. The EPB asked the FCC to preempt the phrase "within its service area" and excise those four words from § 7-52-601. *In re City of Wilson*, 2015 WL 1120113, at *10. Wilson asked the FCC to preempt the entirety of Session Law 2011-84. *Id.* at *13.

The FCC concluded that preemption of most of the Tennessee and North Carolina statutes at issue would further the purposes of § 706 of the Telecommunications Act of 1996 by increasing broadband investment. Both Wilson and the EPB sought expansion because the private cable providers in their areas were unsatisfactory to the local residents and businesses. *Id.* at *14. The EPB deployed its Internet services to "take advantages of synergies with existing municipal services," such as its smart power grid for its electric service. *Id.* Wilson likewise deployed Internet in part to save money. *Id.* Further, by virtue of their being municipal providers, the EPB and Wilson are concerned with more than just the "bottom line"—they are also concerned with benefitting the communities they serve. *Id.* According to the FCC, these differing interests support the conclusion that municipal-provider entry into the surrounding areas would increase investment in broadband Internet.

The FCC additionally concluded that preemption of the Tennessee restrictions and allowing the EPB to serve the surrounding areas would promote competition in the broadband marketplace, which is a goal of § 706. In response to the EPB's constructing its fiber network, Comcast stopped raising its rates—which had risen sharply for years—and subsequently reduced them. *Id.* at *15. Both of the private providers in the EPB's electric service area, Comcast and AT&T, have vastly improved their Internet download speeds since the EPB's entry. *Id.* This

demonstrates the benefits of increased broadband competition and how a possible expansion for the EPB could promote such competition.

The FCC likewise found that preemption of most of the North Carolina restrictions would promote and increase competition. In response to Wilson's entry into the broadband market, Time Warner held rates steady in Wilson while simultaneously raising rates in places without such competition. *Id.* Like the private providers' responses to the EPB's entry, Time Warner improved its top download speeds in response to Wilson's entry. *Id.* The FCC concluded that these reactions from Time Warner show that municipal-provider entry into the broadband market increases competition.

Commenters' objections to preemption failed to persuade the FCC. The arguments that municipal providers and private providers are not on "a level playing field" were unpersuasive because, according to the FCC, they show only that municipal providers like the EPB and Wilson differ from private providers but not that the differences are problematic. *Id.* at *16. Some commenters argued that municipal entry would "crowd out" or be unfair to private providers, but the FCC found that Wilson's 33.7% market penetration indeed left room for private providers. *Id.* at *17. The FCC likewise found no evidence to support some commenters' claims that municipal-service providers would act anti-competitively or that such providers would be economically inefficient. *Id.* In response to claims that municipal-broadband providers fail at a high rate, the FCC stated: "We do not read [§] 706 to require us to find that any particular municipal system is certain to succeed if barriers are removed; only that the law is a barrier and that removal is reasonably likely to lead to increased broadband deployment or promote competition." *Id.* at *18. Addressing the substance of the failure claims, the FCC found them meritless. *Id.* at *18–21. Finally, the FCC disposed of what it considered to be weaker objections, finding them unpersuasive or underdeveloped. *Id.* at *21.

The FCC also found that the Tennessee statute constitutes a "barrier" to broadband investment and competition. Tennessee's territorial restriction in § 601—the language "within its service area"—is, according to the FCC, "an explicit barrier to broadband infrastructure investment and competition under [§] 706." *Id.* at *22. Furthermore, "[the] EPB would likely meet the substantial customer demand in surrounding areas absent [§] 601's territorial

restriction." *Id.* at *23. Thus, the FCC stated that Tennessee's territorial restriction falls under the FCC's authorized power to preempt "barriers to infrastructure investment" pursuant to § 706.

North Carolina's Session Law 2011-84, however, required a more in-depth analysis. The law as a general matter was found to constitute a barrier to infrastructure investment and competition. According to the FCC, "this is so even though any single regulatory provision of the statute, if considered independently, might not appear to impose a significant burden." *Id.* at *27. The FCC found that the passage of 2011-84 chilled deployment of municipal broadband in North Carolina. *Id.*

The FCC divided the North Carolina provisions into three categories of restrictions: measures to raise economic costs, obligations that would "level the playing field," and measures to impose delay. *Id.* at *23.

The FCC first considered multiple measures to raise economic costs in Session law 2011-84 and deemed them to constitute barriers. The first provision analyzed was the territorial restriction contained in § 160A-340.1(3), which limits the provision of telecommunication services to "within the corporate limits" of the municipal provider. *Id.* at *28. According to the FCC, there is "no doubt" that the territorial restriction is a "barrier to deployment and competition." *Id.* This is because, absent the restriction, "Wilson and other North Carolina municipalities would . . . be able to invest in broadband networks outside a city's corporate limits 'within reasonable limitations.'" *Id.* Finally, the three limited exemptions to the territorial restriction—labeled the "grandfathering," "interlocal," and "unserved" exemptions—fail to provide meaningful opportunities for municipal-provider entry, according to the FCC. *Id.* The first two exemptions do not allow for municipalities to serve residents and businesses outside of their current service areas, and the "unserved" exemption uses improperly low benchmarks for determining what was an "unserved" location. *Id.* at *28–29. Further, the real-world application of the "unserved" exemption would render service to those areas "economically infeasible" due to the impracticability of obtaining the required information for an area to be labeled "unserved." *Id.* at *30.

The next provisions analyzed were §§ 340.1(a)(9) and 340.5 of Session Law 2011-84, which are provisions requiring payments in lieu of taxes. *Id.* According to the FCC, these provisions, "on their face," constitute barriers by raising the cost of providing service. *Id.*

The third and final "measure to raise economic costs" in the North Carolina law that the FCC analyzed was § 160A-340.1(a)(8), which requires municipalities to impute the costs of private providers when pricing the municipal services. The FCC found that this provision hampers municipalities' ability to offer introductory or other discounts to compete for customers and therefore "limits the competitive pressure on the [private providers] to lower their rates." *Id.* at *30–31.

The FCC next considered North Carolina's provisions that sought to "level the playing field" between municipal providers and private providers. The FCC stated that § 340.1(a)(1), which requires the municipalities to comply with all of the laws and rules that apply to private providers but does not exempt those municipalities from regulations that apply to general municipal operations, results in a double burden for municipal providers rather than a level playing field. *Id.* at *31. The FCC reached a similar conclusion regarding § 340.1(a)(5), which requires the municipalities to open their facilities for private providers at no charge if the municipalities themselves would not have to pay. *Id.* at *32. Private providers of telecommunications services are also exempt from regulation by the state's Utilities Commission, but a separate part of Session Law 2011-84 subjects municipal providers to such regulation. *Id.* With regard to § 340.1(a)(7), which forbids a municipal provider from subsidizing its "communications service with funds from any other non-communications service," the FCC noted that there is no similar limitation on private providers, who could use funds from multiple lines of business to subsidize their communications-service offerings. *Id.* These provisions, the FCC concluded, do not "level the playing field" but rather "function as barriers to and have the effect of increasing the expense of and causing delay in broadband deployment and infrastructure investment." *Id.* at *33.

The final provisions that the FCC analyzed were the "measures to impose delay." The FCC found that "these interrelated provisions lead to significant delay" and that "the time period . . . could be approximately 27 months before a municipality can even launch a municipal

broadband project." *Id.* at *34. Thus, the FCC concluded that §§ 340.3, 340.4, 340.6, and § 3 of Session Law 2011-84 are collectively "a barrier to timely deployment of broadband and infrastructure investment." *Id.* The FCC also concluded that the provisions' application to video and phone services—which are necessary for a municipality's offering of "triple play service"— was a barrier, because municipalities needed to bundle those services with Internet in order to maintain profitability. *Id.* at *35.

The FCC order preempted portions of the Tennessee and North Carolina statutes. The FCC found that Congress, in enacting § 706(a)–(b) of the Telecommunications Act of 1996, vested the agency with the authority to preempt the laws. *Id.* at *37–43. Section 706, entitled "Advanced Telecommunications Incentives" and codified at 47 U.S.C. § 1302, reads in part:

> (a) In general
> The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

> (b) Inquiry
> The Commission shall, within 30 months after February 8, 1996, and annually thereafter, initiate a notice of inquiry concerning the availability of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) and shall complete the inquiry within 180 days after its initiation. In the inquiry, the Commission shall determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. If the Commission's determination is negative, it shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.

The FCC, in its order, seized upon language in both subsections. The FCC stated at the outset that Congress desired to give the FCC broad authority regarding telecommunications:

> 131.    Encouraging broadband deployment is central to federal communications policy. . . . Section 2 of the Communications Act grants the Commission jurisdiction over "all interstate and foreign communication by wire or radio," and broadband Internet access "falls comfortably within the

Commission's jurisdiction" under section 2, and has historically been supervised by the Commission.

> 132.   Within the bounds of these jurisdictional grants, Congress has empowered the Commission with broad authority to "make the major policy decisions and select the mix of regulatory and deregulatory tools the Commission deems most appropriate in the public interest to facilitate broadband deployment and competition."

*Id.* at *38 (footnotes omitted).

The FCC discussed how the preamble of the Telecommunications Act of 1996 states the Act's purposes: the promotion of competition in the telecommunications market and the encouragement of both infrastructure investment and deployment of technologies. *Id.* Section 706, according to the FCC, is the statute that authorizes the FCC to further these purposes:

> 135.   Section 706 shows a unique level of Congressional concern with broadband deployment. Both sections 706(a) and (b) direct that the Commission "shall" take action to promote broadband deployment. Section 706(b), moreover, is unique in requiring the Commission to study broadband deployment and requiring it to take action if the Commission finds that broadband is not being deployed to all Americans in a reasonable and timely fashion. Both sections, in targeting broadband deployment to "all Americans," also reflect Congress's concern with unserved and underserved areas. . . .

> 137.   We have found, . . . in our *2015 Broadband Progress Report*, adopted on January 29, 2015, that broadband has not been deployed in a reasonable and timely fashion to all Americans. In light of this negative finding, section 706(b) commands that we "take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market." Preemption constitutes one such "immediate action" available to us under this independent grant of authority to "fulfill Congress's broadband deployment objectives." . . .

> 139.   In sum, Congress has granted us broad jurisdiction over broadband in the United States, and has specifically mandated that we promote broadband deployment, in section 706.

*Id.* at *39–40 (footnotes omitted).

After concluding that § 706 gives the FCC *some* authority, the FCC analyzed whether that authority includes the ability to preempt state law:

> 142.  In light of Congress's delegation of authority to the Commission to "encourage" and "accelerate" the deployment of broadband to all Americans, we interpret Sections 706(a) and (b) to give us authority to preempt state laws that stand as barriers to broadband infrastructure investment or as barriers to competition. . . . [U]nder *City of New York* and *Crisp*, the relevant inquiry when an agency acts to preempt state law is whether Congress delegated the authority to act in this sphere.  In both of those cases, the Supreme Court found "that the Commission's authority" over cable video programming "extends to all regulatory actions 'necessary to ensure the achievement of the Commission's statutory responsibilities,'" including the preemption of otherwise valid state laws. . . .
>
> 144.  Our preemption authority falls within the "measures to promote competition in the local telecommunications market" and "other regulating methods" of section 706(a) that Congress directed the Commission to use to remove barriers to infrastructure investment.  It likewise falls within the available "action[s] to accelerate deployment" we may take in order to "remove barriers to infrastructure investment" and to "promote competition" described in section 706(b).  As Congress would have been aware in passing the 1996 Act, the Commission has in the past used preemption as a regulatory tool where state regulation conflicts with federal communications policy.  Given this history against which Congress legislated, the best reading of section 706 is therefore that Congress understood preemption to be among the regulatory tools that the Commission might use to act under section 706.

*Id.* at *40–41 (footnotes omitted).  The FCC defended this conclusion against various counterarguments to the effect that Congress may authorize preemption only with explicit statutory language:

> 145. . . . The law is clear that Congress need not "explicitly delegate" the authority to preempt.  In fact, Congress's decision not to specifically identify preemption is to be expected where, as here, the Commission had previously preempted state law even where the relevant statutes contained no express discussion of preemption.  Consistent with that practice, Congress drafted section 706 in broad terms, directing the Commission to use "measures that promote competition" and to do so in "a manner consistent with the public interest, convenience, and necessity."  That Congress provided a small number of specific examples in section 706(a), such as price cap regulation and regulatory forbearance, does not exclude other measures within the Commission's authority.  Indeed, the language of section 706(a) supports this understanding, directing the Commission and State commissions to use "measures that promote competition in

the local telecommunications market" or "other regulating methods that remove barriers to infrastructure investment." Such methods would of course include those listed, but would also include additional methods, including preemption, rulemaking, or other appropriate methods. In sum, we find that section 706 incorporates the rule common throughout communications law: the Commission may preempt state laws regarding interstate communications where they conflict with federal communications policy.

*Id.* at *41 (footnotes omitted).

After reaching the conclusion that § 706 delegates to the FCC the general authority to preempt state laws, the FCC then analyzed whether § 706 authorizes preemption in the context of state laws regulating municipal subdivisions:

> 146. . . . [W]e now address whether [§ 706] may at least sometimes provide authority to preempt state laws that regulate the provision of broadband by a state's political subdivisions. We find that sections 706(a) and (b) both do give us that authority in certain circumstances. Two different views support our authority. First, the Commission has concluded that broadband services are jurisdictionally interstate for regulatory purposes. Congress has delegated authority to the Commission to regulate interstate services. Second, even if that were not sufficient, section 706 makes clear that Congress has mandated that the Commission remove "barriers" to broadband deployment and infrastructure investment and promote competition in the local telecommunications market. Whether something constitutes a barrier or promotes competition is a question of the kind that Congress intended the Commission, as the Nation's expert agency of communications, to answer and to govern. For these reasons, we find that where a state law regulating the provision of broadband by a political subdivision serves to effectuate communications policy as opposed to core state control of political subdivisions, and where that law stands as a barrier to broadband infrastructure investment or an impediment to competition, such laws conflict with our authority to ensure the deployment of broadband to all Americans on a reasonable and timely basis and so may be preempted. . . .
>
> 147. . . . [W]here a state has authorized municipalities to provide broadband, and then chooses to impose regulations on that municipal provider in order to effectuate the state's preferred communications policy objectives, we find that such laws fall within our authority to preempt. To take an example, where a state allows political subdivisions to provide broadband, but then imposes regulations to "level the playing field" by creating obligations apparently intended to mirror those borne by private providers, it does so in order to further its own policy goals about optimal competitive and investment conditions in the broadband marketplace. The states here are deciding that incumbent broadband providers require protection from what they regard as unfair competition and

regulating to restrict that competition. This steps into the federal role in regulating interstate communications. Where those laws conflict with federal communications policy and regulation, they may be preempted. We thus interpret [sub]sections 706(a) and 706(b) to give us authority to preempt state laws that regulate the provision of broadband by political subdivisions, provided that the law in question serves to effect communications policy and would frustrate broadband deployment "on a reasonable and timely basis . . . to all Americans."

*Id.* at *42 (footnotes omitted).

According to the FCC, § 706 provides this preemption authority because telecommunications is an area in which a federal law preempts a state law when the two laws conflict. Further, the FCC reasoned that "a state law that effectuates a policy preference regarding the provisions of broadband is not shielded from all scrutiny simply because it is cast in terms that affect only municipal providers." The FCC, however, noted limitations on its ability to preempt such state laws:

149. Conversely, we do not read this preemptive authority under section 706 to reach all state laws that may have an effect, however indirect, on the provision of broadband by municipalities. Although a law could have an indirect effect of restricting the class of entities that may provide broadband in the state, it may not rise to the level of a restriction on competition or barrier to broadband deployment or infrastructure investment within our section 706 authority to preempt.

150. We have before us specific petitions to preempt specific laws. . . . [O]ur authority to preempt is limited to laws that serve to effect state policy regarding the provision of broadband, as opposed to laws that have an indirect effect on the provision of broadband, such as those that serve the traditional state function of granting or withholding authority to political subdivisions.

*Id.* at *43 (footnotes omitted). The FCC thus found that Congress granted it authority to preempt most of the Tennessee and North Carolina laws. It found this authority notwithstanding commenters' counterarguments based on the Telecommunications Act as well as Supreme Court decisions and the Tenth Amendment.[1] *Id.* at *43–44.

Bringing its analyses together, the FCC preempted the territorial restriction in the Tennessee statute as well as the provisions in the North Carolina Session Law that it deemed to

---

[1]These counterarguments are addressed in depth below.

be "barriers." Because the territorial restriction in Tennessee's § 601 "serves as a state law communications policy regulation, as opposed to a core state function in controlling its political subdivisions," the FCC found the restriction to fall within its authority to preempt under § 706 of the Telecommunications Act of 1996. *Id.* at \*49–50. It further reasoned that the "level playing field" provisions, "measures to raise economic costs," and "measures to impose delay" of North Carolina's Session Law 2011-84 regulated "not issues of state sovereignty and political determination, but rather the mechanics of how a city may provide a service it is authorized to provide."[2] *Id.* at \*50–54. The sections of the Session Law that were not deemed to constitute barriers were left untouched by the FCC's preemption.[3] The FCC therefore granted the EPB's petition and granted in part the City of Wilson's petition.

The FCC's grant of these petitions did not result in a requirement for either the EPB or the City of Wilson to expand their offerings, to charge a certain rate, or to roll out their services promptly. Instead, the FCC's grant required Tennessee and North Carolina to give their municipalities the choice of whether to undertake these discretionary actions.

Commissioner Pai, in dissent, contended that *Nixon v. Missouri Municipal League*, 541 U.S. 125 (2004), interpreting principles underlying the Constitution, compelled the conclusion that the FCC had no power to preempt the Tennessee and North Carolina laws without a clear statement from Congress. *Id.* at \*71–76. Commissioner Pai also contended that § 706 did not grant the FCC *any* preemption authority whatsoever. *Id.* at \*78–81.

**Judicial Review**

Tennessee filed a petition for review of the FCC's order with this court. North Carolina filed its petition for review with the Fourth Circuit. The Fourth Circuit then transferred the case to this court, and the cases were consolidated. We granted petitions to intervene brought by the National Association of Regulatory Utility Commissioners (NARUC), the EPB, and the City of

---

[2]The provisions that were preempted: §§ 340.1(a)(1), (3), and (5)–(9); 340.3; 340.4; 340.5; 340.6; and Session Law 2011-84 §§ 1.(a) and (b); 2.(a); 3; and 5.

[3]The provisions that did not constitute barriers and were therefore not preempted: §§ 160A-340(1), (2), (3), (4), (5), and (6); 340.1(a)(2) and (4); 340.1(b), 340.2; and Session Law 2011-84 §§ 1.(c), 2.(b), 4, 6, 7, and 8. *Id.* at \*55.

Wilson. The United States is also a party, but the Department of Justice's Antitrust Division—on behalf of the United States—filed a letter stating without elaboration that it "takes no position in these cases."

Tennessee argues that the FCC's order violates the Constitution by infringing on the state's right to determine the boundaries of its political subdivisions. Tennessee, North Carolina, and NARUC argue that even if Congress has the power to authorize such orders, it has failed to provide the necessary clear statement as required by *Nixon*. The latter argument is persuasive, at least where—as here—the FCC order purports only to restrict the states' power to make decisions for municipalities that the FCC does not otherwise forbid.

### The Clear Statement Rule Applies

Under federal law, municipal telecommunications providers currently have the option to expand their geographic service areas or to restrict their service areas to their municipal boundaries. There are no federal statutes or regulations requiring telecommunications providers to have a set geographic service area. Providers thus have discretion to choose the geographic areas that they serve, whether that means expansion or restriction. Providers likewise have discretion to choose the rates they charge for their services and how long the services-rollout process takes.

What the FCC seeks to accomplish through preemption is to decide *who*—the state or its political subdivisions—gets to make these choices. The FCC wants to pick the decision maker for the discretionary issues of expansion, rate setting, and timeliness of rollout of services. It wants to provide the EPB and the City of Wilson with these options notwithstanding Tennessee's and North Carolina's statutes that have already made these choices.

Precedent makes clear, however, that if Congress has the power to allocate state decision making, it must be very clear that it is doing so. As the Supreme Court stated in *Nixon*, the clear statement rule applies when federal-government preemption results in "interposing federal authority between a State and its municipal subdivisions, which our precedents teach, 'are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion.'" 541 U.S. 125, 140 (2004) (citing *Wis.*

*Public Intervenor v. Mortier*, 501 U.S. 597, 607–08 (1991); *Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 433 (2002)); *see also City of Abilene, Tex. v. F.C.C.*, 164 F.3d 49, 53 (D.C. Cir. 1999). The political subdivisions of a state are nothing more than that state's "convenient agencies," and the state generally retains the power to make discretionary decisions for its subdivisions, just as a board of directors generally retains the power to make discretionary decisions for a company. Any attempt by the federal government to interpose itself into this state–subdivision relationship therefore must come about by a clear directive from Congress, and the FCC can only pick the decision maker here if there exists a clear statement to do so in § 706.

*Nixon* supports the conclusion that the clear statement rule applies here. In *Nixon*, a Missouri state statute forbade municipalities from entering the telecommunications market altogether. 541 U.S. at 129. The FCC, under § 253 of the same Telecommunications Act at issue in this case, held that there was no clear statement from Congress to preempt the Missouri law. *Id.* The Supreme Court agreed with the FCC and held that a clear statement was needed because federal preemption of Missouri's law threatened "to trench on the States' arrangements for conducting their own governments." *Id.* at 140–41. This case similarly involves Tennessee's and North Carolina's arrangements for conducting their own governments: if there is a decision to make, one way for states to conduct their own governments is to make the decision for their municipalities. Any attempt by the federal government to reorder the decision-making structure of a state and its municipalities trenches on the core sovereignty of that state. *Nixon* involved Missouri's making a choice for its municipalities on the issue of whether to provide telecommunications services at all. No federal regulation or statute existed that required municipalities to provide telecommunications; the decision whether to provide services was left to the discretion of the provider. The present case involves two states that likewise have made discretionary determinations for their political subdivisions. *Nixon* is therefore analogous regarding the clear statement rule and supports the rule's applicability in this case.

The FCC sought to distinguish *Nixon* on the ground that there is a difference between preempting a state-law ban on municipal telecommunications providers and preempting state laws regulating municipal broadband providers for which the state has given an underlying authorization. *In re City of Wilson*, 2015 WL 1120113, at *47–48. The distinction, however,

does not hold up. It is true that the *Nixon* Court, in identifying the "strange and indeterminate results" that would arise, reasoned that if the FCC preempted the ban on municipal providers, "[t]he municipality would be free of the statute, but freedom is not authority, and in the absence of some further, authorizing legislation the municipality would still be powerless to enter the telecommunications business." *Nixon*, 541 U.S. at 135. This would produce a "national crazy quilt" of municipalities in some states being able to provide services based on state laws authorizing them to do so while municipalities in other states would still be without any power due to the absence of an authorizing statute. *Id.* at 136. It is true that this particular anomaly does not arise when the FCC's preemption applies only to municipalities authorized to provide telecommunications services. But a related anomaly, and one equally intrusive on state-municipal relations, is presented. States can flatly prohibit municipalities from engaging in telecommunications altogether, but they cannot do it in limited steps or with conditions based on the governmental nature of the municipalities. This state of affairs, in short, would be at least as anomalous a result.

In any event, the anomalous result of the preemption was only one of the two bases for the Court's decision in *Nixon*. In the alternative, the Court reasoned, if the preemption in *Nixon* "could operate straightforwardly to provide local choice," then "the liberating preemption would come only by interposing federal authority between a State and its municipal subdivision," thus triggering the clear statement rule. *Id.* at 140–41. The same is true here.

The FCC falls short in its attempt to distinguish *Nixon* on the ground that the state laws here do not implicate concerns about core state sovereignty like *Nixon*'s Missouri law. The FCC stated in its order and argues on appeal that Tennessee's and North Carolina's laws "target the regulation of broadband . . . as opposed to . . . go[ing] to the historic police powers of the states." *In re City of Wilson*, 2015 WL 1120113, at *45. Based on this purported distinction, the FCC concluded in its order that "the Tennessee and North Carolina statutes do not implicate core attributes of state sovereignty but rather regulate interstate communications services that are at the heart of the [FCC]'s jurisdiction." *Id.* But the same was true in *Nixon*, because the Missouri statute there forbade municipalities from entering the telecommunications market. 541 U.S. at 129. The statutes at issue here implicate core attributes of state sovereignty *and* regulate

interstate communications services, just like the statute in *Nixon*. These effects are not mutually exclusive.

Finally, the FCC sought to distinguish *Nixon* on the ground that the Court was upholding the agency's order, rather than reversing it as we do today. *In re City of Wilson*, 2015 WL 1120113, at *47. The distinction only makes a difference if we are required to apply *Chevron* deference to the agency ruling in this case. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The first step of Chevron, however, requires that, "if the intent of Congress is clear, that is the end of the matter." *Id.* at 842–43. The force of the clear statement rule, as applied in the next section, makes the intent of Congress clear in this case: § 706 does not authorize the preemption attempted by the FCC. There is certainly room for the application of canons of construction to ascertain whether the first step of *Chevron* has been met. *Id.* at 843 n.9; *Alliance for Cmty. Media v. F.C.C.*, 529 F.3d 763, 777 (6th Cir. 2008); *Gerson v. Comm'r*, 507 F.3d 435, 439 (6th Cir. 2007). Perhaps the strongest case for using a canon of construction at the first step of *Chevron* is where, as here, the canon is strong enough to act as a clear statement rule, and where the canon is firmly based not only on what Congress is presumed to intend, *see Nixon*, 541 U.S. at 140–41, and on fundamental constitutional policy.

Chattanooga's home-rule status likewise does not compel a different conclusion. When a Tennessee municipality adopts home-rule status, it elects to govern itself, and the state legislature may only interfere with municipalities via "laws which are general in terms and effect." *See* Tenn. Const. Art. XI, § 9. The EPB argues that because Chattanooga is a home-rule municipality, the relationship between Tennessee and the EPB is weaker, and the FCC's preemption is correct. Chattanooga's home-rule status is hardly relevant to the issues in this appeal—the validity of § 7-52-601 under the Tennessee constitution is not contested.

A different issue would be presented if there were a federal regulation or statute that removed all discretion from providers, and a state then enacted a law requiring a municipality to violate the regulation. For example, assume a federal regulation requiring a class of telecommunications providers to provide services to areas of at least fifty square miles, and a state law restricting the geographic area municipal providers could serve to areas of twenty-five

square miles or less.  We need not decide whether the clear statement rule would apply in that situation.  That simply is not the case here.

Similarly, the examples put forward by the FCC are not analogous to the present case. The FCC's examples of federal regulations on radio licensees' broadcast frequency and strength, bandwidth size, and other non-communications regulations such as OSHA workplace safety standards all involve situations in which the federal government has removed discretion from regulated parties in a particular area.[4]

**Section 706 Lacks a Clear Statement**

Section 706 does not contain a clear statement authorizing preemption of Tennessee's and North Carolina's statutes that govern the decisions of their municipal subdivisions. Section 706(a) instructs the FCC to utilize "measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment."  Subsection (b) is a similar but broader instruction—it directs the FCC to "remov[e] barriers to infrastructure investment and . . . promot[e] competition in the telecommunications market."  "Remove barriers to infrastructure investment" is unclear regarding whether it applies to public *and* private infrastructure investment or *only* private infrastructure investment. "Infrastructure," by itself, is not specific to the public sphere.  Furthermore, nowhere in the general charge to "promote competition in the telecommunications market" is a directive to do so by preempting a state's allocation of powers between itself and its subdivisions.  Although preemption authority does not have to be explicit, *see Gregory v. Ashcroft*, 501 U.S. 453, 467 (1991), the authority to preempt such allocations must be delegated by way of a clear statement. In applying the clear statement rule, the federal statute "should be treated with great skepticism[] and read in a way that preserves a State's chosen disposition of its own power, in the absence of

---

[4]The FCC quotes out of context the Supreme Court's statement that "an 'assumption' of non-preemption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 107–08 (2000).  The assumption that *Locke* referred to was the general assumption "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  This general presumption, overcome in *Locke* itself, is not the same as the clear statement rule at issue in the instant case.  Indeed, *Locke* involved rules regarding the design and operation of oil tankers without regard to whether the tankers were operated by municipalities.  *Locke* had no hint of a municipal-powers issue.

the plain statement that *Gregory* requires." *Nixon*, 541 U.S. at 141. Because § 706 cannot be read to limit a state's ability to trump a municipality's exercise of discretion otherwise permitted by FCC regulations, § 706 cannot be read to authorize such preemption.

A comparison to the provision at issue in *Nixon* demonstrates § 706's lack of a clear statement. In *Nixon*, municipalities sought the FCC's preemption of state laws under 47 U.S.C. § 253. *Nixon*, 541 U.S. at 129. That provision states that "[n]o State or local statute or regulation . . . may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). The *Nixon* Court found the language "any entity" to be ambiguous and susceptible to readings that included either private entities alone or public *and* private entities. 541 U.S. at 132–33. Thus, following the clear statement rule, the Court found that the federal statute did not authorize preemption of Missouri's regulations of its municipalities. *Id.* at 140–41. It can hardly be argued that § 706 is a clearer directive than § 253; the directives in § 706—to remove barriers and to promote competition—do not make clear whether public entities are included.

Our holding today is a limited one. We do not question the public benefits that the FCC identifies in permitting municipalities to expand Gigabit Internet coverage. Furthermore, we need not, and do not, address a number of legal issues debated by the parties, including (1) whether § 706 provides the FCC any preemptive power at all, (2) whether Congress, if it is clear enough, could give the FCC the power to preempt as it did in this case, (3) whether, if the FCC had such power, its exercise of it was arbitrary or capricious in this case, and (4) whether and to what extent the clear statement rule would apply to FCC preemption if a State required its municipality to act contrary to otherwise valid FCC regulations.

The petitions for review are accordingly granted, and the FCC's order is reversed.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part. I agree that *Nixon v. Missouri Municipal League*, 541 U.S. 125 (2004), compels us to reverse the FCC's preemption of the geographical restrictions of both States' statutes as well as several other provisions of the North Carolina statute. I write separately to address a few issues left open by the majority, to explain what I understand to be the scope of the clear-statement rule, and because I conclude that at least one of the North Carolina provisions was validly judged by the FCC as pertaining solely to the regulation of broadband, and not the State's ordering of its government.

The FCC correctly finds in § 706 of the Telecommunications Act of 1996, 47 U.S.C. § 1302, a Congressional grant of authority to preempt the enforcement of state laws that directly conflict with Congress' intent as expressed in the Telecommunications Act. Section 706's directive is broad; if the FCC finds that advanced telecommunications capability is not being deployed to all Americans in a reasonable and timely fashion, "it shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market." 47 U.S.C. 1302(b). Thus, if telecommunications resources are not being reasonably and timely deployed, the FCC is directed to remove barriers and promote competition. *Id.* If a state statute is a barrier to infrastructure investment and competition, § 706 authorizes the FCC to remove it by preempting its enforcement. For me, the only question is whether Congress intended to grant the FCC authority to preempt enforcement of state laws restricting municipal authority.

As the majority explains, *Nixon* makes clear that *Gregory*'s[1] clear-statement requirement applies to the FCC's powers under the Telecommunications Act to preempt state laws concerning municipal authority to provide telecommunications services. Maj. Op. at 21-22. The FCC is no doubt accurate in its characterization of the statutes at issue as legislation intended to

---

[1]*Gregory v. Ashcroft*, 501 U.S. 452 (1991).

further the States' "own policy goals about optimal competitive and investment conditions in the broadband marketplace," and as effectuating a judgment that "incumbent broadband providers require protection from what they regard as unfair competition." *In re City of Wilson, N.C. Petition for Preemption of N.C. General Statute Sections 160A-340 et seq.*, 30 FCC Rcd. 2408 (March 12, 2015). Nevertheless, as the majority observes, a statute can address both governmental authority and the effectuation of substantive policy. Maj. Op. at 19-20. The statutory provisions imposing geographical limitations on the provision of broadband clearly concern the States' arrangements for conducting their own governments, including how municipalities interact with each other. Likewise, the provisions of the North Carolina law that require notice, comment, a hearing process, and a special election before a municipality can construct a telecommunications network clearly involve the core of the State's regulation and control of the power granted to its municipalities, as does the provision barring a municipality from subsidizing its communications service with funds from other services. Because these provisions address the States' historic authority to govern through its subdivisions, a clear statement of Congressional intent to preempt that authority is necessary.

I do not, however, understand the clear-statement cases to require a clear statement whenever the state statute or regulation sought to be preempted affects local government in any fashion. The rationale for requiring a clear statement is that certain powers and spheres are historically so clearly confided to the States that Congress should not be understood to preempt the States' authority to act freely in those areas unless its intent is clear. North Carolina's requirement that municipalities impute the costs of private providers when pricing municipal services, including telecommunication services, N.C. Gen. Stat. § 160A-340.1(a)(8), has little to do with the State's core sovereign power to order its government. Rather, it is an expression of its telecommunications policy that private providers must be protected from a municipal provider's unfair advantage. While the other provisions discussed above serve dual purposes that preclude their preemption even if the communications-policy purpose is in reality paramount, the provision requiring the imputation of costs is exclusively regulatory and commercial.

Lastly, I agree that the FCC's preemption decision is not entitled to *Chevron* deference. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Chevron* applies only where "Congress has not directly addressed the precise question at issue" and the "statute is silent or ambiguous with respect to the specific issue" leaving the agency to fill the gap. *Id.* at 842–43. But that very silence or ambiguity with respect to whether Congress intended to preempt the states' regulation of their subdivisions triggers application of the clear statement rule; thus, application of *Chevron* deference to the FCC's determination that it has the authority to preempt in this situation—as distinguished from the decision whether to exercise the authority to preempt—would turn the clear statement rule on its head.