Catherine PHILLIPS, et al., Plaintiffs,

Russell Bellant; Tawanna Simpson; Lamar Lemmons; Elena Herrada; Donald Watkins; Kermit Williams; Juanita Henry; Mary Alice Adams; William Kincaid; Paul Jordan; Bernadel Jefferson; Dennis Knowles; Jim Holley;

Charles E Williams; Michael A Owens; Lawrence Glass; Deedee Coleman; Allyson Abrams, Plaintiffs-Appellants,

v.

Richard D. SNYDER; Andrew Dillon, Defendants-Appellees.

No. 15-2394

United States Court of Appeals, Sixth Circuit.

Argued: August 4, 2016

Decided and Filed: September 12, 2016

**ARGUED**: Herbert A. Sanders, The Sanders Law Firm, P.C., Detroit, Michigan, John C. Philo, Sugar Law Center for Economic & Social Justice, Detroit, Michigan, Julie H. Hurwitz, Goodman and Hurwitz, P.C., Detroit, Michigan, for Appellants. Ann M. Sherman, Office of the Michigan Attorney General, Lansing, Michigan, for Appellees. **ON BRIEF**: Herbert A. Sanders, The Sanders Law Firm, P.C., Detroit, Michigan, John C. Philo, Sugar Law Center For Economic & Social Justice, Detroit, Michigan, Julie H. Hurwitz, William H. Goodman, Goodman and Hurwitz, P.C., Detroit, Michigan, Mark P. Fancher, ACLU Fund of Michigan, Detroit, Michigan, Cynthia Heenan, Constitutional Litigation Associates, P.C., Detroit, Michigan, for Appellants. Ann M. Sherman, Office of the Michigan Attorney General, Lansing, Michigan, for Appellees.

Before: SUHRHEINRICH, ROGERS, and GRIFFIN, Circuit Judges.

## OPINION

ROGERS, Circuit Judge

When the finances of a Michigan municipality or public school system are in jeopardy, a state law allows for the temporary appointment of an emergency manager to right the ship. An emergency manager's powers in pursuing this end are extensive and arguably displace all of those of the local governmental officials. Plaintiffs, voters in areas with emergency managers and local elected officials in those areas, filed suit and argue that, by vesting elected officials' powers in appointed individuals, the law violates their substantive due process right to elect local legislative officials. Using similar reasoning, they argue that the law violates the Constitution's guarantee, in Article IV, § 4, of a republican form of government. They assert additional claims under the First and Thirteenth amendments as well as a claim under the Voting Rights Act. Plaintiffs appeal the district court's dismissal of their claims. Because the relevant constitutional and statutory provisions do not support relief

for plaintiffs, the district court's dismissal of the claims was proper.

Michigan has a long history of municipal financial crises following national and global economic depressions and recessions. According to plaintiffs' amended complaint, Michigan had the fourth-highest number of defaulting municipalities among all states during the Great Depression.

In 1988, Michigan developed its own statutory scheme to deal with municipal insolvency. Public Act 101 of 1988 allowed the state to appoint emergency financial managers (EFMs) over cities experiencing a financial emergency. Two years later, the Local Government Fiscal Responsibility Act, Public Act 72 (PA 72), replaced Public Act 101. PA 72 provided for a local financial emergency review board that would appoint an EFM for a local government only after the governor declared a financial emergency there.

Under PA 72, the local financial emergency review board appointed several EFMs throughout the state. The board appointed EFMs in the municipalities of Hamtramck, Highland Park, Flint, Pontiac, Ecorse, Benton Harbor, and Village of Three Oaks. The board also appointed an EFM for the Detroit Public Schools. Furthermore, under a provision in PA 72 allowing for consent agreements rather than the appointment of an EFM, the city of River Rouge entered into an agreement with the board.

Michigan repealed PA 72 in 2011 when it passed the Local Government and School District Fiscal Accountability Act, Public Act 4 (PA 4). PA 4 changed the title of EFMs to "emergency managers" and expanded the scope of their powers to cover all the conduct of local government. An emergency manager under PA 4 was allowed to act "for and on behalf of" the municipality's elected governing body. *See* PA 4 § 19(2). After the passage of PA 4, what were PA 72 EFMs in Benton Har-

bor, Ecorse, Pontiac, and the Detroit Public Schools were converted to emergency managers under PA 4 and vested with broad power under that statute. There were also new emergency managers appointed under PA 4 in Flint, the Highland Park Public Schools, and the Muskegon Heights Public Schools.

Michigan citizens disapproved of PA 4. Over 200,000 citizens signed petitions to place a referendum on the ballot in 2012 that would reject the law. After an initial challenge to the form of the petitions, the referendum was placed on the ballot. Pursuant to Michigan law, PA 4 was suspended as soon as the petitions were certified and placed on the ballot. PA 72 thus sprang back into effect on August 8, 2012, the day the Michigan Board of Canvassers certified the petitions. State officials then reappointed all PA 4 emergency managers as PA 72 EFMs. At the general election in November of 2012, Michigan citizens rejected PA 4.

After the referendum on PA 4, Michigan passed a new law, the Local Financial Stability and Choice Act, Public Act 436 (PA 436). PA 436, like PA 4, authorizes the appointment of emergency managers. Mich. Comp. Laws § 141.1549. EFMs under PA 72 and emergency managers under PA 4 were automatically converted to emergency managers under PA 436 when that law took effect. § 141.1549(10). Emergency managers under PA 436 exercise the power of the local government. § 141.1549(2). PA 436 also allows the state treasurer to oversee the activities of emergency managers when the governor so chooses. § 141.1549(8).

There are eighteen scenarios contained in PA 436 that act as triggers for the statute. § 141.1544(1)(a)–(r). If one of those scenarios occurs, the "state financial authority" (the state treasurer for a municipality, or the superintendent of public ed-

ucation for a school district, ·§ 141.1542(u)(i)–(ii)) conducts a preliminary review to determine whether a given entity is under "probable financial stress." § 141.1544(3). The financial authority then turns its final report over to a local emergency financial assistance loan board, which is a statutory entity established by § 141.932. This board reviews the authority's report and makes an official finding of either probable financial stress or no financial stress. § 141.1544(3). If the board reaches a conclusion of probable financial stress for an entity, the governor appoints a "review team." § 141.1544(4), (5). Within sixty days of a review team's appointment, it must turn in a report to the governor that reaches a conclusion on whether a financial emergency exists within the reviewed local government. § 141.1545(3), (4). Within ten days after receiving the review team's report, the governor determines whether a financial emergency exists or not. § 141.1546(1). A local government is provided an opportunity to appeal this determination to the Michigan court of claims. § 141.1546(3).

A local government has four options when confronted with a finding of a financial emergency: the local government can (1) enter into a consent agreement with the state treasurer; (2) accept the appointment of an emergency manager; (3) undergo a neutral evaluation process, which is akin to arbitration, with its creditors; or (4) enter into Chapter 9 bankruptcy. § 141.1547(1)(a)–(d). Giving local governments these options is one difference between PA 436 and PA 4.

There are other differences between the laws. PA 436 contains provisions for removing an emergency manager after eighteen months of service, and if a local government wishes to have an emergency manager removed before that emergency manager has served eighteen months, the law provides the local government with a mechanism for petitioning the governor to do so. § 141.1549(11). Another new provision in PA 436 allows the governor to appoint a receivership transition advisory board (TAB) once the financial emergency in a given locality has been rectified. § 141.1563. TABs generally monitor the operations of the local government and ensure that it is operating in a financially conscious and sound way. *Id.*

When PA 436 took effect, emergency managers were in place in Allen Park, Benton Harbor, Ecorse, Flint, Pontiac, Detroit, the Detroit Public Schools, Highland Public Schools, and Muskegon Heights Public Schools. The city of Hamtramck has since had an emergency manager placed in control of it, and the emergency managers in Ecorse and Pontiac have been replaced by TABs. A TAB replaced Benton Harbor's emergency manager and subsequently voted to return the city to local control.

Plaintiffs, voters and elected officials from Detroit, Pontiac, Benton Harbor, Flint, and Redford, filed suit. They alleged that PA 436 violates their right to elect local legislative officials under (1) the Due Process Clause of the Fourteenth Amendment to the United States Constitution; (2) the Guarantee Clause of Article IV, § 4 of the United States Constitution; (3) the Fourteenth Amendment's Equal Protection Clause by burdening their right to vote and by discriminating against African Americans, the poor, and those entities that had emergency managers under the previous laws; (4) § 2 of the Voting Rights Act (VRA); (5) the First Amendment by engaging in viewpoint discrimination and infringing on plaintiffs' freedom of speech, freedom of association, and right to petition their government; and (6) the Thirteenth Amendment.

The district court held that plaintiffs had Article III standing, reasoning as follows:

Plaintiffs are residents of cities with [emergency managers], elected officials

of cities or school districts who have actually been displaced by [emergency managers], voters who intend to vote again in the future, and people who are actively engaged in the political process at the local level of government. The harms alleged by plaintiffs are unique as compared to Michigan residents living in cities without an [emergency manager]. The court notes that the sweeping powers under PA 436 appear much more expansive than those given to receivers in Pennsylvania, where standing was not found. *See Williams v. Governor of Pennsylvania*, 552 Fed.Appx. 158 (3rd Cir. 2014). Plaintiffs have already suffered, and continue to suffer, the alleged constitutional deprivations, while the residents of Michigan communities without an [emergency manager] have suffered no such harms. In all instances, the alleged deprivations stem directly from the application of PA 436, and it is also true that the alleged injuries will be redressed by a decision favorable to plaintiffs.

*Phillips v. Snyder*, No. 2:13–cv–11370, 2014 WL 6474344, at *4 (E.D. Mich. Nov. 19, 2014).

The district court proceeded to dismiss almost all of plaintiffs' claims. *Id.* First, the district court held that the Fourteenth Amendment's Due Process Clause does not contain a fundamental right to elect local legislators. *Id.* at *6. With regard to the Guarantee Clause claim, the court held that the Clause does not apply to local governments. *Id.* Reasoning that the Equal Protection Clause protects the right to vote on an equal footing in a particular jurisdiction, the court dismissed plaintiffs' first Equal Protection Clause claim be-

cause, so limited, the right was not violated. *Id.* at *8. The court likewise dismissed the Equal Protection claim based on wealth discrimination because, according to the court, PA 436 does not restrict plaintiffs' ability to vote based on their wealth. *Id.* at *12. The court also held that the final Equal Protection claim could not succeed because PA 436 has a rational basis for its differential treatment. *Id.* at *13.

The court held that PA 436 imposed no impediment to voting that was required to violate § 2 of the VRA, and the court therefore dismissed that claim. *Id.* at *14–16. The First Amendment Claims failed because there were no infringements on speech rights that resulted from PA 436. *Id.* at *16–18. The court also dismissed the Thirteenth Amendment claim, because plaintiffs still have available to them what the court deemed "every device in the political arsenal." *Id.* at *19.

The only claim to survive dismissal was the Equal Protection claim based on discrimination against African-Americans. *Id.* at *10–12. In a move that permitted the instant appeal to go forward promptly, however, the parties stipulated to a dismissal of this claim without prejudice.

Plaintiffs filed the present appeal, presenting many of the same arguments rejected by the district court. The defendants argue that plaintiffs lack standing, that the case is moot, that the Guarantee Clause claims are not justiciable, and that the district court's dismissal was correct in all other respects. Although the district court had jurisdiction under Article III, plaintiffs' constitutional claims are without merit, and the district court's dismissal of the claims was proper.[1]

---

1. Plaintiffs Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 were named in neither the amended complaint in the district court, nor the notice of appeal. These three plaintiffs—parties to the city of

Detroit's bankruptcy proceedings—were named in the original complaint in this case, and the district court did not remove their names from the docket after the amended

## I.

 Most of the plaintiffs have alleged that they, as residents or elected officials of cities and school districts that have been subjected to emergency managers, have already suffered and continue to suffer unique harms that stem directly from the procedures set forth in PA 436. All but one of the plaintiffs is a resident or an elected official of Detroit, Pontiac, Benton Harbor, Flint, or the Detroit Public Schools. These cities and schools were under emergency managers when the plaintiffs filed their amended complaint. These plaintiffs therefore, at least at that time, allegedly suffered constitutional deprivations and other harms that residents and elected officials of cities without emergency managers did not suffer, as explained by the district court. Accordingly, plaintiffs suffered the "concrete and particularized" injuries required for standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), that affect them in personal and individualized ways. This removes plaintiffs' injuries from the realm of generalized grievances. The injury was ongoing and thus actual and imminent as opposed to conjectural or hypothetical, therefore satisfying the second part of the injury inquiry outlined in *Lujan. Id.* Further, these alleged deprivations stem directly from the application of PA 436 to plaintiffs' cities or schools and

would be redressed by a decision favorable to plaintiffs. Most of the plaintiffs have therefore established standing under Article III.[2]

It is true that the municipalities where plaintiffs reside or are elected officials are not currently governed by an emergency manager. However, the municipalities where most of the plaintiffs reside are currently governed by TABs that have final authority to govern those cities. Plaintiffs have challenged the constitutionality of PA 436 in its entirety, not only the provisions that allow the Governor to appoint emergency managers and that prescribe the authority of emergency managers. This includes the provision that provides for TABs, § 141.1563. Thus, according to their allegations, plaintiffs are continuing to suffer constitutional deprivations and other harms as long as PA 436 limits the powers of their local elected officials in any manner.[3] The present case is therefore distinguishable from *Williams v. Governor of Pennsylvania*, 552 Fed. Appx. 158 (3d Cir. 2014), in which the Third Circuit held that plaintiffs lacked standing because of the need for a number of contingent events before a future injury, *id.* at 161–62.

The claims for equitable relief by the plaintiffs from Benton Harbor and the Detroit Public Schools may be moot. The

---

complaint was filed. Thus, although the three plaintiffs were originally included in the official caption of this appeal, this appears to have been a mistake.

**2.** One plaintiff, however, failed to establish standing. Plaintiff Glass is from Redford and is on the Council of Baptist Pastors of Detroit. Because he is a Redford resident, his votes for his local officials have not been affected in any way by an emergency manager. However, when one party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable. *Department of Commerce v. U.S. House of Represen-*

*tatives*, 525 U.S. 316, 330, 119 S.Ct. 765, 142 L.Ed.2d 797 (1990); *see also Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). To the extent that Glass's arguments do not differ from those of the other plaintiffs, his lack of standing does not affect our ability to reach them. To the extent that any of Glass's arguments are Redford-specific, his lack of standing prevents us from reaching them.

**3.** This also proves that the case presented by these plaintiffs is a live controversy and not moot as the defendants attempt to argue.

defendants point to the fact that the TAB in Benton Harbor has voted to return the city to local control and was dissolved on July 1, 2016. The defendants also point out that the Detroit Public Schools will be dissolved pursuant to recently passed Michigan legislation, and operate under a transition manager as of July 1, 2016, until the school board for the new community district takes office in January 2017. However, in line with our resolution of the standing inquiry, whether the claims of these parties are moot is itself a moot issue, as their claims are not distinguishable from those of nonmoot parties whose claims we reject today.

## II.

Plaintiffs' substantive due process claim, based on their asserted right to vote for the individual(s) exercising legislative power at the local level, is contrary to the Supreme Court's venerable holding that states have "absolute discretion" in allocating powers to their political subdivisions (and therefore to the officers running those subdivisions), which are "convenient agencies" created by the states. *City of Pawhuska v. Pawhuska Oil & Gas Co.*, 250 U.S. 394, 397, 39 S.Ct. 526, 63 L.Ed. 1054 (1919); *see also Nixon v. Mo. Mun. League*, 541 U.S. 125, 140, 124 S.Ct. 1555, 158 L.Ed.2d 291 (2004); *Tennessee v. FCC*, No. 15–3291, 832 F.3d 597, 609–10, 2016 WL 4205905, at *10 (6th Cir. Aug. 10, 2016). More particularly, states may allocate the powers of subsidiary bodies among elected and non-elected leaders and policymakers. This power is squarely supported by *Sailors v. Board of Education*, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967). In that case Michigan had established a system for selecting members of a county school board that was "basically appointive rather than elective." 387 U.S. at 109, 87 S.Ct. 1549. The Court stated:

Viable local governments may need innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions. We see nothing in the Constitution to prevent experimentation. At least as respects nonlegislative officers, a State can appoint local officials or elect them or combine the elective and appointive systems as was done here.

*Id.* at 110–11, 87 S.Ct. 1549. *Sailors* therefore indicates that, given the need for states to structure their political subdivisions in innovative ways, there is no fundamental right to have local officials elected. Plaintiffs in the present case assert that *Sailors*'s limited holding applies to only "nonlegislative" officers, and they argue that *Sailors* is therefore distinguishable. But just a few years after *Sailors*, the Court indicated in *Hadley v. Junior College District of Metropolitical Kansas City*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970), that the *Sailors* holding would also apply to legislative officers, by recognizing the untenability of a line between administrative and legislative officers for the purposes of assessing the constitutionality of a state statute determining which persons are to be selected by popular election to perform governmental functions. *Id.* at 55–56, 90 S.Ct. 791. Although *Hadley* was an Equal Protection case, the Court rejected the administrative-legislative distinction and instead characterized the correct constitutional inquiry as whether an individual engages in "governmental activities." *Id.* The Court further stated that the right to vote on an equal basis with other voters applies "*whenever* a state or local government *decides* to select persons by popular election to perform governmental functions," *id.* at 56, 90 S.Ct. 791 (emphasis added), which suggests that a state has the power to decide not to select local officials by election. Together, the cases of *Sailors* and *Hadley* lead to the conclusion that there is no fundamental right to have local officers exercising gov-

ernmental functions selected by popular vote.

■ Plaintiffs' main argument supporting their due process claim misinterprets *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). *Reynolds* stated that "each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies." 377 U.S. at 565, 84 S.Ct. 1362. Plaintiffs argue that because their local officials derive their power from the state of Michigan, the local officials compose a "state legislative body," and *Reynolds* thus stands for the proposition that there is a fundamental right to vote for local legislative officials. With respect, the argument is meritless. American governments, whether state or federal, have subsidiary agencies that are led by appointed officials, and which make orders and regulations that may carry the force of law. *See, e.g., United States v. Mead Corp.,* 533 U.S. 218, 226-27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). No federal constitutional provision requires the administrators or boards that run these agencies to be elected. Suggesting as much would be revolutionary to our way of government, even assuming that a government under such a constraint could even function. Further, *Reynolds* dealt with the election of the state legislature of Alabama. The comment in *Reynolds* about "state legislative bodies" obviously applies to state legislatures. Moreover, the issue in *Reynolds* was the principle of one person, one vote under the Equal Protection Clause. Any asserted right in *Reynolds* was in the context of that Clause. *Reynolds* thus stands for a right to vote for state legislators on an equal footing with other voters in the state

rather than a stand-alone right to vote for legislators.[4] Equal access to the ballot for an elected official simply does not imply that certain officials must be elected.

Although this court has expressed, in a case involving the voiding of absentee ballots, that "[t]he Due Process [C]lause is implicated ... in the exceptional case where a state's voting system is fundamentally unfair," *Warf v. Board of Elections of Green County,* 619 F.3d 553, 559 (6th Cir. 2010), we have never held that the Due Process Clause is implicated when a state decides to appoint local officials instead of having them be elected. Further, the Sixth Circuit cases that plaintiffs cite in this context all address whether states' entire election processes impaired citizens' abilities to participate in state elections on an equal basis with other qualified voters. *See Ne. Ohio Coal. for Homeless v. Husted,* 696 F.3d 580 (6th Cir. 2012); *Warf,* 619 F.3d 553; *League of Women Voters of Ohio v. Brunner,* 548 F.3d 463 (6th Cir. 2008). These cases therefore do not imply, much less recognize, a fundamental right to have local legislative officers be elected.

### III.

■ Moreover, the Constitution's guarantee of a republican form of government in Article IV does not provide plaintiffs with a basis for invalidating PA 436. Traditionally, the Supreme Court "has held that claims brought under the Guarantee Clause are nonjusticiable political questions." *Padavan v. United States,* 82 F.3d 23, 28 (2d Cir. 1996) (citations omitted). The doctrine goes back to *Luther v. Borden,* 48 U.S. 7 How. 1, 12 L.Ed. 581 (1849), and was restated in unqualified fashion in

---

4. Plaintiffs also cite *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), but that case dealt with the entirely different issue of the constitutionality of hurdles facing new parties seeking access to a state gubernatorial

ballot. Language plucked from that decision about the right to vote can be relevant to this case only in the most general and abstract sense.

*Colegrove v. Green*, 328 U.S. 549, 556, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946), and *City of Rome v. United States*, 446 U.S. 156, 182 n.17, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980). In *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118, 141–48, 32 S.Ct. 224, 56 L.Ed. 377 (1912), the Court held not justiciable a Guarantee Clause challenge to a state constitutional provision permitting the bypassing of the state legislature by a voter initiative procedure. In short, it is up to the political branches of the federal government to determine whether a state has met its federal constitutional obligation to maintain a republican form of government. *Id.* at 147, 32 S.Ct. 224. This conclusion disposes of plaintiffs' Guarantee Clause claim.

The Supreme Court more recently—in a challenge to a federal statute—has expressed doubt that all Guarantee Clause challenges are not justiciable, but in doing so did not resolve the issue. *New York v. United States*, 505 U.S. 144, 185, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Even assuming that a challenge based on the Guarantee Clause may be justiciable in some circumstances, we are aware of no case invalidating the structure of *political subdivisions* of states under the Clause. This is not surprising in light of the Supreme Court's repeated indication that states, not federal courts, should determine the structure of political subdivisions within a state. The Court has recognized that "[h]ow power shall be distributed by a state among its governmental organs, is commonly, if not always, a question for the state itself." *Highland Farms Dairy v. Agnew*, 300 U.S. 608, 612, 57 S.Ct. 549, 81 L.Ed. 835 (1937).

Plaintiffs cite two cases for the contention that the Guarantee Clause applies to allocation of powers among political subdivisions, but even if these pre-*Pacific States* cases can be loosely read to contemplate justiciability, they strongly support the conclusion that there is no Guarantee Clause violation here. In *Attorney General of Michigan ex rel. Kies v. Lowrey*, a Michigan statute allocating property between old and new school districts was challenged under the Contracts Clause, the Due Process Clause, and the Guarantee Clause. 199 U.S. 233, 240, 26 S.Ct. 27, 50 L.Ed. 167 (1905). The Supreme Court stated flatly:

> [T]he grounds all depend ultimately upon the same arguments. If the legislature of the State has the power to create and alter school districts, and divide and apportion the property of such district[s], no contract can arise, no property of a district can be said to be taken, and the action of the legislature is compatible with a republican form of government *even if it be admitted* that [Article IV, § 4] of the Constitution ... applies to the creation of, or [to] the powers or rights of property of, the subordinate municipalities of a State. We may omit, therefore, that [S]ection and [A]rticle from further consideration.

*Id.* at 239, 26 S.Ct. 27 (emphasis added). *Forsyth v. City of Hammond*, 166 U.S. 506, 17 S.Ct. 665, 41 L.Ed. 1095 (1897), an even earlier case, concerned an Indiana statute authorizing the annexation of contiguous territory to the limits of a city by a court rather than the state legislature. Although the case involved a city's territory, the Guarantee Clause argument was one of separation of powers between the judiciary and the legislature of the *state* government. *Id.* at 519, 17 S.Ct. 665. The case says nothing about the republican form of the city. Moreover, with respect to the state separation-of-powers issue, the Court reasoned that "there is nothing in the federal Constitution to prevent the people of a state from giving, if they see fit, full jurisdiction over such matters to the courts and taking it entirely away from the legislature." *Id.* These cases provide no support

for either the justiciability or the validity of a Guarantee Clause challenge to the form of government of a political subdivision of a state.

## IV.

 With regard to the plaintiffs' claims under the Equal Protection Clause, PA 436 passes rational basis review. The financial conditions of plaintiffs' localities are the reasons for the appointments of the emergency managers. An entity in a distressed financial state can cause harm to its citizenry and the state in general. Improving the financial situation of a distressed locality undoubtedly is a legitimate legislative purpose, and PA 436, while perhaps not the perfect remedy, is one that is rationally related to that purpose. The emergency manager's powers may be vast, but so are the problems in financially distressed localities, and the elected officials of those localities are most often the ones who—through the exercise of their powers—led the localities into their difficult situations. A rational relationship to a legitimate governmental purpose is all that is required for a law to pass this low form of scrutiny. *See, e.g., Armour v. City of Indianapolis,* —— U.S. ——, 132 S.Ct. 2073, 2080, 182 L.Ed.2d 998 (2012). PA 436 therefore does not violate the Equal Protection Clause.

 Plaintiffs also claim that PA 436 violates the Equal Protection Clause by discriminating against entities already having EFMs from PA 72, but this claim lacks merit. Under § 141.1549(6)(c), an EFM appointed under PA 72 who was still serving in that capacity at the time of the Act's taking effect was deemed to be an emergency manager under PA 436. That individual would then be subject to the eighteen-month provision in PA 436 and would effectively remain in place longer than an emergency manager who was appointed for the first time under the new law. *Id.* Plaintiffs argue that this treats them in a discriminatory manner. This different treatment, however, is justified for the reasons stated by the district court: the eighteen-month limitation on removal is rational, because the managers in place before PA 436 took effect had much less power under PA 72 than they did under PA 436. Giving these individuals time to adjust to the new, broad powers is a legitimate interest, and giving them the same eighteen months as other emergency managers to work with these powers is rationally related to that interest. Although plaintiffs argue that the emergency managers appointed under PA 4—who became EFMs when PA 72 sprang back into effect—did not change any of their practices after the referendum, this fact if accurate does not affect the rationality of a distinction based on their power to change their practices. Whether those managers violated PA 72 by overstepping their statutory powers is also not relevant to the rationality of the distinction. The district court's dismissal of this claim was therefore correct.

 There is, moreover, no basis for applying scrutiny stricter than rational basis review. The plaintiffs argue for stricter scrutiny on the theory that PA 436 violates the Equal Protection Clause by denying their right to vote and by conditioning their vote on wealth. However, neither of these theories requires that PA 436 be subjected to higher scrutiny.

*Right to Vote.* PA 436 does not impair plaintiffs' right to vote under the Equal Protection Clause. Plaintiffs are still provided a vote. PA 436 does not remove local elected officials; it simply vests the powers of the local government in an emergency manager. Plaintiffs argue, however, that as a practical matter they are unable to elect the people exercising local legislative power while individuals in areas without emergency managers have the ability to do so.

But Equal Protection close scrutiny has not been applied beyond the right to vote on an equal footing with other citizens in a given jurisdiction, in cases such as *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), which involved residency duration requirements for voting. In particular, in cases where the issue is whether an election is required in the first place, the Court has declined· to apply close scrutiny. For instance, in *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 10, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982), the Court rejected a challenge to a procedure whereby vacancies in the Puerto Rico legislature could be filled on an interim basis by political parties. The Court reasoned that "[t]he right to vote, *per se*, is not a constitutionally protected right," and that the Constitution does not "compel[ ] a fixed method of choosing state or local officers or representatives." *Id.* at 9, 102 S.Ct. 2194 (citation and internal quotation marks omitted). The Court further explained:

> To be sure, when a state or the Commonwealth of Puerto Rico has provided that its representatives be elected, "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens ·in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336[, 92 S.Ct. 995, 31 L.Ed.2d 274] (1972). *See Kramer v. Union Free School District*, 395 U.S. 621, 626–629[, 89 S.Ct. 1886, 23 L.Ed.2d 583] (1969); *Gray v. Sanders*, 372 U.S. 368, 379–380[, 83 S.Ct. 801, 9 L.Ed.2d 821] (1963). However, the Puerto Rico statute at issue here does not restrict access to the electoral process or ·afford unequal treatment to different classes of voters or political parties. All qualified voters have an equal opportunity to select a district representative in the general election; and the interim appointment provision applies uniformly to all legislative vacancies, whenever they arise.

*Id.* at 10, 102 S.Ct. 2194. A similar distinction applies here. Plaintiffs have not shown that they have been denied the right to vote on equal footing within their respective jurisdictions. Individuals in jurisdictions without emergency managers are not relevant to the protected right. In short, geographical or other distinctions regarding the allocation of responsibilities among elected and appointed bodies must have a rational basis, but if they do, there is no basis for stricter scrutiny if there is equal access to the ballot with respect to voting for the elected bodies.

*Wealth.* Plaintiffs claim that the distinctions between communities with and without emergency managers are based on race, but plaintiffs have voluntarily dismissed that claim. They instead argue for stricter scrutiny based on wealth discrimination. Such a claim, however, does not require scrutiny any closer than rational basis scrutiny. Plaintiffs argue that the financial condition of a local government—the basis for an emergency manager appointment—is the same as the wealth of the people who reside in that government's area. This is factually and logically incorrect. The solvency of a local government is the result of the management of the finances of that government. Although solvency may correlate with the wealth of a locality's residents, solvency and wealth are separate concepts. Indeed, it is possible for a locality with wealthy residents to become insolvent and subject to PA 436.

In any event, a legal distinction among political subdivisions that ultimately affects people differently based on wealth does not—without the involvement of some other fundamental right or suspect category—implicate closer scrutiny than rational basis review. This conclusion is clearly required by the Supreme Court's holding in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36

L.Ed.2d 16 (1973). The Supreme Court in that case rejected the application of strict scrutiny to Texas's system of local-property-ty-based financing of public education, and in particular a claim based on "district wealth discrimination," reasoning in part:

> [I]t is clear that appellees' suit asks this Court to extend its most exacting scrutiny to review a system that allegedly discriminates against a large, diverse, and amorphous class, unified only by the common factor of residence in districts that happen to have less taxable wealth than other districts. The system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.

*Id.* at 28, 93 S.Ct. 1278 (footnote omitted). This reasoning disposes of any wealth-based discrimination argument for strict scrutiny in this case.

## V.

■ PA 436 also does not violate § 2 of the Voting Rights Act (VRA). In making their VRA claim, plaintiffs attempt to fit a square peg into a round hole. Section 2 states that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied ... which results in a denial or abridgement of the right of any citizen ... to vote on account of race or color." 52 U.S.C. § 10301(a). Plaintiffs argue that the emergency manager provision denies their right to vote. *Mixon v. Ohio*, however, held that § 2 of the VRA does not cover appointive systems. 193 F.3d 389, 407–08 (6th Cir. 1999). *Mixon* involved the Cleveland School District's changing the selection of the Cleveland School Board from an elective system to an appointive one. *Id.* at

394. The Court stated that allowing § 2 challenges to states' choices between elective and appointive systems would be an interpretation that would "reach[ ] too far." *Id.* at 408. *Mixon* is analogous to the present case. In enacting PA 436, Michigan made a choice between allocating certain powers to appointed individuals rather than elected ones. Thus, § 2 does not provide plaintiffs an avenue for recovery, and the district court correctly dismissed this claim. Plaintiffs argue that *Mixon* is distinguishable because, in that case, a statute changed the process for selecting school board members, while the elective office in the present case remains intact. It is difficult to see why this distinction should make a Voting Rights Act difference.

■ *Presley v. Etowah County Commission*, 502 U.S. 491, 504, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992), also supports dismissing plaintiffs' claim under VRA § 2. In *Presley*, the Court employed a "direct relation to voting" test to determine when a change in a standard, practice, or procedure falls under VRA § 5. *Id.* at 506, 112 S.Ct. 820. "Changes which affect only the distribution of power among officials" and "delegat[e] ... authority to an appointed official" fail this test, and the VRA therefore does not cover them. *Id.* at 506, 507, 112 S.Ct. 820. Plaintiffs correctly note that there is a difference in scope between § 5 and § 2. *See Holder v. Hall*, 512 U.S. 874, 882, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (plurality opinion). Although *Presley* dealt with a § 5 claim, its reasoning applies *a fortiori* to the § 2 claim here. First, the § 5 language that the Supreme Court focused upon in *Presley* was "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting," language indistinguishable from that of § 2 ("voting qualification or prerequisite to voting, or standard, practice, or

procedure ... [resulting] in a denial or abridgement of the right ... to vote ...”). The *Holder* Court, in distinguishing § 2 and § 5, held that “we do not think that the fact that a change in a voting practice must be precleared under § 5 necessarily means that the voting practice is subject to challenge in a dilution suit under § 2.” *Id.* at 883, 114 S.Ct. 2581. In other words, for purposes of interpreting these words, § 5 if anything is *broader* than § 2.[5] And while *Presley* did contemplate that a “*de facto* replacement of an elective office with an appointive one” was not within its holding, *id.* at 508, 112 S.Ct. 820, plaintiffs agree that there was no replacement of an elective office with an appointive one in this case. Their elected officials still retain some (although limited) powers under PA 436. *Presley* thus supports the applicability of our *Mixon* holding in this case: VRA § 2 does not apply, because this is not a case involving a voting qualification or prerequisite to voting or standard, practice, or procedure resulting in the denial of a right to vote.

## VI.

■■■ Turning to the First Amendment claims, the enactment of PA 436 was not an instance of viewpoint discrimination against plaintiffs. Plaintiffs, along with a significant number of Michigan voters, indeed voted to repeal PA 4. The legislature then enacted PA 436, a law that plaintiffs admit is different from PA 4. Because plaintiffs admit that PA 436 is different, the analysis need not go any further. Furthermore, Michigan would have been allowed to pass PA 436 even if it were identical to PA 4. *See Michigan Farm Bureau v. Hare*, 379 Mich. 387, 151 N.W.2d 797, 802 (1967). In any event, the fact that a legislature passes new legislation similar in import to legislation previously vetoed by referendum does not restrict the expression of one's viewpoint. The legislature either had the power to repass similar legislation or it did not. No one's ability to express views was infringed.

Nothing in PA 436 abridges plaintiffs' rights to freedom of speech and to freedom of association. A removal or modification of government power can hardly be equated to a restriction on speech. If it were, all reallocations of the legislative powers of political subdivisions would be subject to heightened scrutiny under the First Amendment—an entirely unprecedented and anomalous result.

This reasoning would apply regardless of whether the plaintiff elected officials were left with no governmental power, but that is not even the case. Local officials under PA 436 may, by a two-thirds vote, petition for removal of an emergency manager before the emergency manager has served for eighteen months. Mich. Comp. Laws § 141.1549(11). Furthermore, after the emergency manager has served for eighteen months, the same two-thirds vote of the local government removes the emergency manager. § 141.1549(6)(c). PA 436 also presents local government officials in a financial emergency with four options, and only one of those options is the appointment of an emergency manager. This suggests that local officials are generally still empowered to act under PA 436. Citizens are still able to advocate for the removal of the emergency manager, and the decision to appoint an emergency manager can be appealed under PA 436. Citizens are also able to vote out their local officials who got them into the financial emergency, the state legislators who enacted PA 436, and the governor who appointed an emergency manager.

**5.** We recognize, of course, that in other respects § 5 is narrower than § 2. *See Reno v.*

*Bossier Parish School Bd.*, 520 U.S. 471, 478–79, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997).

PA 436 therefore does not abridge plaintiffs' First Amendment rights.

## VII.

 Plaintiffs' final claim, resting on the Thirteenth Amendment, though eloquently presented at oral argument, is without merit. PA 436's focus on financial emergencies makes this case similar to *City of Memphis v. Greene*, 451 U.S. 100, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981). That case involved the closure of a street in Memphis that allegedly had the effect of segregating races within the city. *Id.* at 102, 101 S.Ct. 1584. However, the Court decided that this action did not violate the Thirteenth Amendment as a "badge or incident of slavery," because "a regulation's adverse impact on a particular neighborhood will often have a disparate effect on an identifiable ethnic or racial group" due to urban neighborhoods' being often "characterized by a common ethnic or racial heritage." *Id.* at 128, 101 S.Ct. 1584. Similarly here, PA 436 looks to the financial health (or lack thereof) of municipalities. Plaintiffs do not challenge the label of "financial emergency" being attached to their localities. There is no sufficiently direct connection to race in PA 436 that could amount to something, in the words of the Supreme Court in *Greene*, "comparable to the odious practice the Thirteenth Amendment was designed to eradicate." *Id.* Plaintiffs cite no case law that brings their facts anywhere near the prohibitions of the Thirteenth Amendment. The state's remedy for financially endangered communities—passed by state-elected bodies for which African-Americans have a constitutionally protected equal right to vote, and facially entirely neutral with respect to race—are far removed from being a "badge" of the extraordinary evil of slavery.

## VIII.

The district court's dismissal of plaintiffs' claims is accordingly affirmed.